STATE OF MINNESOTA

IN SUPREME COURT

A21-1531

Court of Appeals                                                                      Chutich, J.
                                        Dissenting, Gildea, C.J., Anderson, Hudson, JJ.

Byron Johnson,

                    Respondent,

vs.                                                                  Filed: September 20, 2023
                                                                     Office of Appellate Courts

Kaija Freborg,

                    Appellant.

_____


Scott. M. Flaherty, Taft Stettinius & Hollister LLP, Minneapolis, Minnesota; and

John G. Westrick, Samuel A. Savage, Savage Westrick, PLLP, Bloomington, Minnesota, for respondent.

Alan P. King, Daniel E. Hintz, Natalie R. Cote, Goetz & Eckland P.A., Minneapolis, Minnesota, for appellant.

_____


S Y L L A B U S

1.     Analysis of the totality of the circumstances—including the content, form, and context of defendant's Facebook post that accused the plaintiff in this defamation action and two other dance instructors of sexual assault—shows that her speech involved a matter of public concern, namely, sexual assault in the context of the #MeToo movement.

1

2.	Because a genuine issue of material fact exists as to the truth or falsity of defendant's alleged defamatory statement, we cannot resolve the issue of actual malice upon appeal; accordingly, we remand the matter to the district court for trial on the issues of veracity and actual malice.

Reversed and remanded to the district court for further proceedings.

O P I N I O N

CHUTICH, Justice.

This case involves a defamation claim brought by respondent Byron Johnson—a private figure—against appellant Kaija Freborg. Johnson sued Freborg after a post on Freborg's Facebook page accused Johnson and two other dance instructors from the Twin Cities dance community of varying degrees of sexual assault. Johnson was one of Freborg's dance teachers, and the two previously had a casual sexual relationship that lasted for about a year.

The district court granted Freborg's motion for summary judgment, finding that Freborg's speech was true and, alternatively, that her speech involved a matter of public concern and was not made with actual malice. The court of appeals reversed. It held that the truth or falsity of Freborg's statement presented a genuine issue of material fact. The court of appeals further held, in a divided opinion, that because the dominant theme of Freborg's post involved a matter of private concern, Johnson was not required to prove actual malice to recover presumed damages. The court of appeals remanded the case to the district court for further proceedings.

2

We granted Freborg's petition for review on whether her statement involved a matter of public concern. Because the overall thrust and dominant theme of Freborg's post—based on its content, form, and context—involved a matter of public concern, namely, sexual assault in the context of the #MeToo movement, her statement is entitled to heightened protection under the First Amendment to the United States Constitution. Before Johnson may recover presumed damages, he must therefore show that Freborg's speech was not only false, but also that the post was made with actual malice.

Accordingly, we reverse the court of appeals on the issue of public concern and remand the case to the district court for further proceedings to determine the veracity of Freborg's post and, if the post is found to be false, whether the making of the post meets the constitutional actual-malice standard.

**FACTS**

Freborg and Johnson met in 2011, and Freborg, then a faculty member at a local university, began to take dance lessons from Johnson at a Twin Cities dance studio. Sometime in 2012, the parties began a casual sexual relationship. Freborg agrees that many of their sexual encounters were consensual. She claims, however, that not all of their interactions were consensual, including an allegation that Johnson approached her in 2015 at his home during a party "while [she] was intoxicated and alone, grabbed [her] hand and put it down his pants onto his genitals" without her consent. This allegation, and its veracity, is at the heart of her Facebook post and the litigation.

After the 2015 party, Freborg and Johnson ended their sexual relationship and continued to contact one another only in the context of dance lessons; these dance-related

3

communications lasted until sometime in 2017. By 2020, they had not spoken to one another for several years.

On July 14, 2020, Freborg posted the following public message[1] on her Facebook page:





After receiving feedback about her message, Freborg clarified in the post's comment thread that she was not accusing Johnson of rape ("[t]his type of coercion [rape] has nothing to do with [Johnson]"). She also edited her post 2 days later to exclude allegations of rape:

---

[1] Johnson alleges Freborg's post reached thousands of Facebook users, many of whom were not Facebook "friends" with Johnson or Freborg.



**Kaija Rae**
July 14 · 🌐

Feeling fierce with all these women dancers coming out. So here goes... I've experienced varying degrees of sexual assault** by the following dance instructors: Byron Johnson, Saley Internacional, and Israel Llerena. If you have a problem with me naming you in a public format, then perhaps you shouldn't do it 🙅🙅🙅
#metoo
#dancepredators

**I was given feedback from a good friend of mine about how words like rape from a white woman can be triggering for black men. I want to respect the black men out there reading this and so I have changed the wording in this post. These are important discussions to have and I appreciate the incredible friends I have who are willing to support me and also call me out. Thank you!! 🙏

🥰😢😮 Angie Liuzzi, Madel Dueñas and 305 others     182 Comments 16 Shares

👍 Like          💬 Comment          ➤ Share

Johnson posted a response on Freborg's public Facebook thread:



**Byron Johnson**
**Kaija Rae** There is no good way to respond to this post but I'm gonna try anyway. I believe that my silence would only stand to indict me further. The fact that you can tag me in this post means that we are friends or were at one time.

I AM CONFUSED. Please tell me what exactly are you saying that I did to you? Or why you think my name belongs on this post?

This is a very serious accusation which I categorically deny.

We haven't spoken in a very long time but we can do better than this. I am not here to shame, I'm here to say that I just don't understand why my name is on this post. I've been nothing but nice and or accommodating to you every occasion I can remember. Frankly, I'm at a loss. I hope you can offer some clarity.

Like · Reply · 6w                                         8

5

Freborg posted the following response on the thread:

 **Kaija Rae**
In all honesty I'm not interested in any kind of manipulative cat and mouse game with you. If you're "confused" (as I've heard many people say when gaslighting others to get outcomes they want) I suggest you talk to the many, many other women you've done this to or better yet talk to a therapist. "We" do not need to do better, you do.

Like · Reply · 6w  18

Over 300 people "reacted" to Freborg's posts, 182 readers commented on them, and they were publicly "shared" 16 times.

Some of the response to Freborg's posts was positive. Commenters told her that she was "brave" and a "survivor." Others seemingly reinforced her posts by explaining their own negative experiences in the Twin Cities dance community. For example, one commenter noted that Freborg was "not the only one of us who has been sexually assaulted in the dance world." Another commented that she does not "dance in certain spaces within the [Twin Cities] because of feeling diminished, preyed upon, unvalued, etc."

Other commenters, however, came to Johnson's defense. One person, for example, explained that people should "wash [their] laundry at the COURTS" and only come forward on social media "after the person [accused of sexual assault] is PROVEN guilty." Another accused Freborg of slander and criticized her unwillingness to engage with Johnson's response to her posts.

In response to the varied comments to her posts, Freborg later explained that she "did this for the safety of other women, and really to show that we as women can disrupt

the status quo by calling sh*t out." On July 27, 2020, just shy of 2 weeks after the original post was published, Freborg deactivated her Facebook account, removing the post and its thread from public view.

Johnson sued Freborg for defamation. He claimed that both Freborg's original and edited posts accused Johnson of raping Freborg, thereby painting him as a rapist. Johnson argued that his reputation suffered as a result and that he lost business because of the posts. After discovery, Freborg moved for summary judgment claiming that: (1) her speech was true; (2) her speech was a matter of public concern; and (3) Johnson failed to show that her speech was made with actual malice.

To support her summary judgment motion on the issue of public concern, Freborg presented the following evidence about the global impact of the #MeToo movement. The #MeToo movement was conceived to allow women to share their experiences of sexual assault and harassment and to seek accountability from their abusers.[2] The hashtag collects the posts and enables a community discussion to occur on the subject of sexual abuse. One study submitted by Freborg stated that the movement "was exceptionally effective in rapidly increasing awareness around sexual misconduct," and that researchers have opined that "social movements [like #MeToo] can rapidly affect the norms for behavior by changing perceptions of a societal problem."

Freborg also submitted information about sexual assault specifically in the dance community. She submitted a blog titled "Dance Predators" that provided suggestions on

---

[2]     Freborg submitted articles in support of her summary judgment motion showing that the movement gained international attention—particularly on social media—in 2017 during the Harvey Weinstein sexual abuse scandal in Hollywood.

7

how to combat predatory behavior by dance instructors; a news story by Minnesota Public Radio about sexual assault in a local Twin Cities dance studio; and seven other social media posts from dancers, two posted the same day as Freborg's post in July, that called out the predatory behavior of three prominent international dance instructors in the global dance community.

Johnson also moved for partial summary judgment on the issues of liability and actual malice. Additionally, he moved to amend his complaint to add a claim for punitive damages. Johnson claimed that Freborg's posts involved a matter of private, not public, concern because even if the #MeToo movement qualifies as a matter of public concern, Freborg's specific posts were personal in nature. He asserted that the sources Freborg relied upon about the dance community were insufficient to show that her speech involved a matter of public concern. Johnson also argued that Freborg's posts suggested that Johnson raped her even though she openly admitted he had not, so Freborg acted with actual malice because she knowingly posted false information. He asked the district court for a jury trial only on the issue of damages.

The district court granted Freborg's motion for summary judgment. First, the court found that Freborg's statements were true. Second, the court rejected Johnson's claim that the posts were too personal in nature to be a matter of public concern, specifically relying on Freborg's use of the #MeToo hashtag and the context of the posts. The court also noted that "[t]he record is replete with other content regarding this specific problem [sexual assault] in this specific community [the Twin Cities dance community]." Finally, the district court found that—even if Freborg's speech was false—Johnson failed to show

8

actual malice, which is required to recover presumed damages for defamatory statements that involve a matter of public concern.

The court of appeals reversed. *Johnson v. Freborg*, 978 N.W.2d 911 (Minn. App. 2022). The court held that a genuine issue of material fact existed about the veracity of Freborg's posts, making summary judgment inappropriate. *Id.* at 917–18. In a divided opinion, the court further held that Freborg's speech was a matter of private, not public concern. *Id.* at 923. The court therefore did not reach the issue of actual malice. *Id.* at 923 n.25.

One judge dissented, stating that the totality of circumstances showed that Freborg's statements relate to a matter of public concern. *Id.* at 924–29 (Wheelock, J., concurring in part, dissenting in part). Considering the content, form, and context of the speech, the dissent reasoned that Freborg "made the post as part of a now-global conversation about the prevalence of sexual harassment and assault and the need to shine light on once-secreted personal experiences." *Id.* at 926.

Freborg petitioned this court for review on one issue: whether her speech involved a matter of public concern, which we granted. She does not challenge the court of appeals' conclusion that a genuine issue of material fact exists about the veracity of her speech and agrees that a remand to the district court is appropriate on this issue. Consequently, we do not address the veracity issue further here and limit our analysis to the claim that her speech involved a matter of public concern.

## ANALYSIS

We review the district court's grant of summary judgment de novo. *Maethner v. Someplace Safe, Inc.*, 929 N.W.2d 868, 874 (Minn. 2019). To decide whether summary

9

judgment is appropriate, we must determine "whether the district court erred in its application of the law to the facts." *Id.* (citation omitted) (internal quotation marks omitted). In addressing whether a statement involves a matter of public concern, federal courts have viewed the issue as a question of law, *see Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983), and we likewise review the question of whether speech involves a matter of public concern de novo. We also review de novo the determination of "[w]hether evidence in the record is sufficient to support a finding of actual malice." *Maethner*, 929 N.W.2d at 879 n.7.

## I.

To determine whether Freborg's speech involved a matter of public concern, we start with some general principles involving defamation. "Under the common law, a plaintiff pursuing a defamation claim 'must prove that the defendant made: (a) a false and defamatory statement about the plaintiff; (b) in [an] unprivileged publication to a third party; (c) that harmed the plaintiff's reputation in the community.' " *Maethner*, 929 N.W.2d at 873 (alteration in original) (quoting *Weinberger v. Maplewood Rev.*, 668 N.W.2d 667, 673 (Minn. 2003)). Certain types of speech, like accusations of "criminal behavior or moral turpitude"—including accusations of sexual assault—are considered "defamation per se." *Id.* at 875 (citing *Richie v. Paramount Pictures Corp.*, 544 N.W.2d 21, 25 (Minn. 1996) (internal quotation marks omitted). If a statement is found to be defamatory per se, we then presume harm to a plaintiff's reputation without requiring the plaintiff to prove actual damages. *Id.* Johnson asserts that he is entitled to presumed damages under this standard.

10

Like all laws regulating speech, however, "the doctrine of defamation per se cannot offend the constitutional guarantees of the First Amendment." *Id.* We have long recognized that "personal reputation has been cherished as important and highly worthy of protection." *Jadwin v. Minneapolis Star & Trib. Co.*, 367 N.W.2d 476, 491 (Minn. 1985). But we cannot "offer recourse for injury to reputation at the cost of chilling speech on matters of public concern, which 'occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.' " *Maethner*, 929 N.W.2d at 875 (quoting *Snyder v. Phelps*, 562 U.S. 443, 452 (2011)).

Given this commitment to "uninhibited, robust, and wide-open" debate on issues of public concern, *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), "a private plaintiff may not recover presumed damages for defamatory statements involving a matter of public concern unless the plaintiff can establish actual malice." *Maethner*, 929 N.W.2d at 878–79. To meet this constitutional actual-malice standard, "a statement must be 'made with the knowledge that it was false or with reckless disregard of whether it was false or not.' " *Id.* at 873 (quoting *Weinberger*, 668 N.W.2d at 673) (internal quotation marks omitted). Freborg contends that this heightened standard applies to her speech because her posts involved a matter of public concern.

In *Maethner*, a defamation case, we held that the determination of whether speech is of public or private concern in a particular case is "based on a totality of the circumstances." *Id.* at 881. In particular, "courts should consider the content, form, and context of the speech." *Id.* "No single factor is 'dispositive;' rather, courts should 'evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said.' " *Id.* (quoting *Snyder*, 562 U.S. at 454). In addition, in weighing the

11

circumstances of the speech, we must make "an independent examination of the whole record." *Snyder*, 562 U.S. at 454 (citation omitted) (internal quotation marks omitted).

*Maethner* involved statements by Maethner's ex-wife—posted on her private Facebook page under the name Jacki Hansen Maethner—identifying herself as a survivor of domestic violence, as well as an article published in a newsletter of a domestic violence organization describing the "Survivor Award" that she had received. *Maethner*, 929 N.W.2d at 871. Maethner's ex-wife and the organization also posted pictures on Facebook of her holding the award. *Id.*

Even though he was not named in the posts, Maethner claimed that, given the use of his distinct last name by his ex-wife, the speech essentially accused him of domestic violence. *Id.* at 872. We recognized that "as a general proposition," speech relating to domestic violence is a matter of public concern. *Id.* at 881. But, in addition to the subject of the speech, we explained that "the form and the context of the speech must also be considered, as well as any other relevant factors." *Id.* Because neither the district court nor the court of appeals had specifically addressed the issue of public concern, we remanded the case back to the district court "to decide in the first instance whether the challenged statements involve a matter of public or private concern." *Id.* at 881–82.

Similar to *Maethner,* we recognize that "as a general proposition," speech relating to sexual assault is a matter of public concern. *See also Richie*, 544 N.W.2d at 26 (concluding that "discussion of sexual abuse of children by their parents and legal recourse available to the abused child" were "certainly of public concern"). But *Maethner* clearly instructs us that no per se rule applies to suggest that statements about sexual abuse (or any other crime) are *always* matters of public concern. Instead, we must, on a case-by-case

12

basis, apply the totality of the circumstances test and balance the content, form, and context of the speech, as well as any other pertinent factors, to determine whether speech involves a purely private matter or is a statement about a matter of public concern intended to influence public discussion about desired political or social change. Balancing the totality of the circumstances of the Facebook posts here, we conclude that, although the speech involved personal aspects, the predominant theme of Freborg's speech involved a matter of public concern, namely sexual assault in the context of the #MeToo movement.

A.

We begin with the content—the "what"—of Freborg's speech, and we review the entire thread of the Facebook postings when determining whether "a forbidden intrusion on the field of free expression" has occurred. *See Sullivan*, 376 U.S. 284–86; *see also Snyder*, 562 U.S. at 453–54. The subject of the Facebook posts involved accusations of sexual assault by three dance instructors in the local Twin Cities dance community. In her first post, Freborg stated that she had been "gaslighted/coerced into having sex, sexual[ly] assaulted, and/or raped" by three specific dance instructors, including Johnson. She amended her post 2 days later to delete the word "raped," stating instead that she had "experienced varying degrees of sexual assault" by the three dance instructors, again including Johnson.[3] The last line of the original and amended posts stated, "If you have a problem with me naming you in a public format, then perhaps you shouldn't do it."

---

[3] Freborg's amended post stated that she changed the wording of her original post based on feedback from a good friend that the word "rape" could be a trigger word. She also acknowledged in the Facebook thread and in private Facebook messages that Johnson never raped her.

13

In evaluating whether these personal portions of Freborg's posts—the identification, tagging, and admonishing of the three instructors—make the speech a private affair, we must weigh these statements against the remaining text. First, the original and amended post prominently begin with this statement: "Feeling fierce with all these women dancers coming out." Then, before listing the varying degrees of sexual assault that she says she experienced, Freborg states, "So here goes . . . ." This introduction suggests that she was encouraged by other women speaking out about sexual assault in the dance community to reveal her own experience and to add her voice to the community conversation.

Second, Freborg ends her posts with the well-known #MeToo hashtag and a #DancePredators hashtag, connecting her experience directly to the dance community and the broader #MeToo movement. This social movement is characterized by survivors of sexual abuse creating social media posts disclosing their experiences with sexual violence and identifying their abusers. Benedetta Faedi Duramy, *#MeToo and the Pursuit of Women's International Human Rights*, 54 U.S.F. L. Rev. 215, 217 (2020). The movement seeks to connect survivors, encourage victims to tell their story, and increase awareness of the scope of the problem of sexual assault. JoAnne Sweeney, *Social Media Vigilantism,* 88 Brook. L. Rev. 1175, 1219–21 (2023). " 'For many #MeToo claimants, what they want is to tell their story.' Indeed, the phrase 'me too' is inherently about connection; it tells others that they are not alone and that they are understood. Such affirmations can be healing in their own right as a form of social support." *Id.* at 1219 (citation omitted).

Third, her subsequent explanation of her motives in the post thread—that she made the posts "for the safety of other women" and to show how "women can disrupt the status quo"—suggests that her posts were an attempt to raise awareness for other women,

14

including women in the dance community, and inspire social change. These three factors, considered together, in addition to the broader context and response to the posts, show that Freborg frames her Facebook posts "as her contribution to the larger discussions occurring at the time of the #MeToo movement." *Coleman v. Grand,* 523 F. Supp. 3d 244, 259 (E.D.N.Y. 2021).

Johnson claims that the explicit use of "you" three times in the last line of the initial and amended post to condemn the instructors' alleged abusive behavior, and Freborg's reply to his comment on her posts, show that the content of Freborg's speech was not to add her voice to the #MeToo movement but to get "vengeance" on him. He asserts that Freborg's posts—identifying him and two other instructors in the local dance community—were too limited in scope to implicate the broader #MeToo movement. He further contends that his preexisting relationship with Freborg shows that she used the movement to mask a purely private attack on his character. He cites the Supreme Court's decision in *Snyder* to show that the content of Freborg's posts was personal in nature.

A preexisting relationship—or the lack thereof—is certainly a consideration in weighing whether the speech involves a matter of public concern. *See Snyder*, 562 U.S. at 455 (stating that there was no prior relationship between the Westboro Baptist Church and the soldier "that might suggest Westboro's speech on public matters was intended to mask an attack on Snyder over a private matter"). Here, however, two considerations cause us not to heavily weigh Johnson's assertion that Freborg's speech was a matter of private concern because she was a "jilted former lover, who waited five years before publicly attacking Johnson." First, the passage of that many years between the end of the parties' relationship, which Johnson described as a "casual sexual relationship," and the post

15

suggests that the speech was not a personal attack in response to the relationship ending. Second, the inclusion of two other dance instructors implies that the post had less to do with Freborg's previous relationship with Johnson, and more about speaking up about alleged sexual abuse in the Twin Cities dance community generally.

Johnson cites the Supreme Court's decision in *Snyder* to show that the content of Freborg's post was personal in nature. In *Snyder*, the issue was whether the speech of the leader of the Westboro Baptist Church could receive First Amendment protection when he organized a protest with offensive placards near the funeral of a soldier killed in the Iraq war. The signs included general messages such as "God Hates the USA/Thank God for 9/11," "America is Doomed," "God Hates Fags," and "Priests Rape Boys." *Snyder*, 562 U.S. at 448, 454. The Court held that the signs addressed "matters of public import" including "homosexuality in the military, and scandals involving the Catholic clergy." *Id.* The Supreme Court acknowledged, however, that the content of a few signs like "You're Going to Hell" and "God Hates You" could be viewed as containing personal messages to the dead soldier and his family. *Id.* The Court concluded, however, that the few personal messages did "not change the fact that the overall thrust and dominant theme of Westboro's demonstration spoke to broader public issues." *Id.*

After weighing the personal aspects of the posts here with those elements addressing broader public issues, we reach a similar conclusion about content: even though Freborg named, tagged, and admonished three specific instructors in her post, these personal messages do not outweigh the dominant theme of her speech—to discuss sexual assault in the dance community, a matter of public import.

16

The dissent takes a narrow view of a "matter of public concern," essentially limiting those matters "to self-government," "government officials," or "government performance." But that narrow perspective is rooted primarily in decades-old Supreme Court case law. *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334 (1974); *Time, Inc. v. Firestone*, 424 U.S. 448 (1975). The dissent's narrow perspective disregards the development of the law over the past five decades and the Supreme Court's broader view of matters of public concern. According to a more recent case, "Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.' " *Snyder*, 562 U.S. at 453 (citations omitted), *quoted in Maethner*, 929 N.W.2d at 880.[4] As we noted in *Maethner*, speech involving a matter of

---

[4]    The dissent suggests that because *Snyder* involved a claim for intentional infliction of emotional distress, the public concern test from *Snyder* does not apply in the context here, a defamation action. But we have previously articulated the exact same public concern test from *Snyder* in a defamation action: "that '[s]peech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community' or when the subject of the speech is 'of general interest and of value and concern to the public.' " *Maethner*, 929 N.W.2d at 880 (quoting *Snyder*, 562 U.S. at 453). We explained that "[t]he facts of *Snyder* are particularly helpful in illustrating how to analyze whether statements are ones of public concern" and cited *Snyder* for the articulation of " 'some guiding principles' " for distinguishing between a public and a private concern. *Id.* (quoting *Snyder*, 562 U.S. at 452). And we specifically explained that these guiding principles apply "in determining the constitutional protections afforded to speech in tort actions," without distinguishing between actions for intentional infliction for emotional distress and other tort actions like defamation. *Id.*
    We are not alone in relying on *Snyder* to guide the public concern determination in tort actions generally. For example, in considering whether speech qualified as a matter of public concern, the Second Circuit explained that the *Snyder* public concern test applies to "*any tort* alleging reputational harm," "regardless of the claim at issue, be it defamation, intentional infliction of emotional distress, or negligence." *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 129 (2d Cir. 2013) (emphasis added); *see also, e.g.*, *Cousins v. Goodier*,

public concern is within "the core of First Amendment protection . . . to assure the unfettered interchange of ideas for the bringing about of political and *social changes* desired by the people." *Maethner*, 929 N.W.2d at 879 (citation omitted) (internal quotation marks omitted) (emphasis added).[5]

Consistent with *Snyder*, we conclude that Freborg's Facebook post fits this broader conception of public concern.

Finally, although not binding upon us when weighing the content of Freborg's speech, we find persuasive a recent defamation case with similar facts. *Fredin v. Middlecamp,* 500 F. Supp. 3d 752 (D. Minn. 2020), a*ff'd*, 855 F. App'x 314 (8th Cir. 2021) (per curiam) (unpublished). In *Fredin* the federal district court, applying Minnesota law,

---

283 A.3d 1140, 1149–52 (Del. 2022) (applying the *Snyder* public concern test to hold that a claimed defamatory email was "speech that addressed a matter of public concern: the ongoing national debate about the use of American Indian iconography in sports logos," noting that "the First Amendment's Free Speech Clause can serve as a defense in *state tort suits*" generally (emphasis added)); *Monge v. Univ. of Pa.*, ___ F. Supp. 3d ___, No. CV22-2942, 2023 WL 3692935, at *2 (E.D. Pa. May 26, 2023) (applying the *Snyder* public concern test to a defamation claim). Overall, it is the nature of the *speech itself* that guides our public concern inquiry, not the nature of the claim.

[5]   Even if we were to view matters of public concern as relating primarily to "self-government" or "government performance," there are strong indications that the #MeToo movement has catalyzed government action. For example, since 2017, several federal laws have been amended or passed in direct response to the movement. *See, e.g.,* Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 13307, 26 U.S.C. § 162(q)(1) (removing tax deductions for "any settlement or payment related to sexual harassment or sexual abuse if such settlement or payment is subject to a nondisclosure agreement"); Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, Pub. L. No. 117-90, § 2(a), 136 Stat. 27 (2022) (amended the Federal Arbitration Act, 9 U.S.C. § 402, to make any "predispute arbitration agreement or predispute joint-action waiver" for sexual harassment claims unenforceable); Speak Out Act, 42 U.S.C. §§ 19401–04 (recognizing that because "[s]exual harassment and assault remain pervasive in the workplace and throughout civic society," 42 U.S.C § 19401(1), "no nondisclosure clause or nondisparagement clause agreed to before the dispute arises shall be judicially enforceable" 42 U.S.C § 19403(a)).

found that a post on a public Twitter account that included pictures of a person and explicitly accused him of repeated sexual harassment and rape qualified as a matter of public concern. *Id.* at 777. In weighing the totality of the circumstances, the district court found that "[t]he content of the speech here addressed harassment and rape, and more specifically, the subject of women coming forward to share their experiences in this regard." *Id.* The court therefore concluded that the speech was entitled to the actual malice standard of protection. *Id.* We believe the same conclusion about content is justified here.

In sum, although Freborg's speech identifies and addresses Johnson directly and has some aspects of airing a personal dispute, the dominant theme of her posts speaks to the broader issue of sexual abuse in the context of the #MeToo movement, a matter of public concern. After seeing other women share their experiences, she offered her own story, hoping to raise awareness about the prevalence of sexual assault, to keep other women safe, and to show that women "can disrupt the status quo" to bring about social change.

B.

Turning next to the form—the "where"—of Freborg's speech, this factor further supports a conclusion that Freborg's posts were on a matter of public concern.[6] Freborg disseminated her speech on her Facebook account, making her post publicly available to anyone. The use of the internationally recognized hashtag for the #MeToo movement allowed her message to be disseminated publicly and broadly on Facebook. Here, the

---

[6] Notably, at oral argument before us, Johnson agreed that the form of Freborg's speech pointed to the posts being a matter of public concern, although he noted that no one factor is dispositive.

#MeToo hashtag does what a public account, blog, or journal dedicated to these issues would by spreading the message to an unlimited audience.

The Supreme Court has acknowledged the power of Facebook, declaring that today "the 'vast democratic forums of the Internet' . . . and social media in particular" provide the "most important places . . . for the exchange of views." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (quoting *Reno v. Am. C.L. Union*, 521 U.S. 844, 868 (1997)). The Court further noted that social media acts as the "modern public square" and that sites like Facebook "allow a person with an Internet connection to 'become a town crier with a voice that resonates farther than it could from any soapbox.' " *Id.* at 107. It follows that Freborg specifically chose this modern public square as a way for her message "to reach as broad a public audience as possible." *Snyder*, 562 U.S. at 454; *see also Fredin*, 500 F. Supp. 3d at 777. Accordingly, this factor weighs in favor of concluding that Freborg's speech involved a matter of public concern.

To be clear, attaching a hashtag—even the well-recognized #MeToo hashtag—to the end of a social media post is not in and of itself determinative of whether the speech involves a matter of public concern. The use of a hashtag is only one relevant consideration in balancing the totality of the circumstances.[7] Importantly, when courts are reviewing the use of a specific hashtag, they should consider all other relevant factors, including content

---

[7] Just as the use of a hashtag does not automatically transform a matter into one of public concern, the naming of a specific person does not mechanically characterize the matter as one of private concern. Such a binary approach would ignore the crux of the inquiry—whether balancing the totality of the circumstances shows that a matter is one of public concern.

and context.[8]  A hashtag, even the globally recognized hashtag at issue here, can never provide blanket First Amendment protections.  The critical question will remain:  based upon the totality of the circumstances in light of the record as a whole, does the speech involve a matter of public or private concern?

## C.

Finally, the full context—the "how"—of Freborg's posts also weighs in favor of holding that her speech involved a matter of public concern.  Johnson agrees that we can and should look at the entire thread associated with Freborg's posts.  He asserts, however, that it engendered "no discussion about how to engage in democratic self-governance," which he maintains would help support Freborg's theory that the context of her post was intended to raise awareness and bring accountability.

The responses to the posts refute that claim on its face.  The posts generated much discussion and mixed reactions:  some gave Freborg their full support and validated the claims in her posts by citing their own negative experiences, while others were critical of the posts and how Freborg chose to speak about what happened to her.  These reactions facilitated conversations about the appropriate measures that victims should take when speaking out and how to properly support sexual assault victims generally.  The robust and unfettered discussion in the thread following the initial post supports the conclusion that the form and context of this speech makes this speech a matter of public concern, rather than a purely private matter.

---

[8]    Here, for example, the hashtag at issue is at the heart of the #MeToo movement— so much so that the *hashtag itself* is directly in the name of the movement and critical to the dissemination of its message and goals.

As discussed above, the context of the #MeToo movement is a key factor in our analysis. The #MeToo movement has had a direct impact on society and how communities address sexual assault across industries. Data shows, for example, the number of sexual harassment complaints the U.S. Equal Employment Opportunity Commission received jumped by 13.6 percent after #MeToo went viral. Sweeney, *Social Media Vigilantism*, 88 Brook. L. Rev. at 1222. Further, reports now show that more people believe that "those who commit harassment or assault are now more likely to be held responsible and victims are more likely to be believed." Anna Brown, *More Than Twice as Many Americans Support Than Oppose the #MeToo Movement*, Pew Rsch. Ctr. 12 (Sept. 29, 2022). And Congress has taken steps to lessen the shroud of secrecy that surrounds settlements relating to sexual harassment or sexual abuse. *See* Speak Out Act, 42 U.S.C. §§ 19401–04; Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 13307, 26 U.S.C. § 162(q)(1).

Many other jurisdictions also have acknowledged the importance of #MeToo speech in the context of the First Amendment. *Fredin*, 500 F. Supp. 3d 752; *Coleman v. Grand*, 523 F. Supp. 3d 244, 259 (E.D.N.Y. 2021) (finding that the open letter that the defendant circulated accusing the plaintiff of abuse and sexual harassment involved a matter of public concern); *Dossett v. Ho-Chunk, Inc.*, 472 F. Supp. 3d 900, 908 (D. Or. 2020) (finding that the publication of workplace-related #MeToo allegations involved a matter of public concern); *Fells v. Serv. Emps. Int'l Union*, 281 A.3d 572, 584 (D.C. App. 2022) (holding that there was a prima facie showing that the publication of workplace-related #MeToo allegations involved a matter of public concern); *Goldman v. Reddington*, No. 18-CV-3662, 2021 WL 4099462, at *4 (E.D.N.Y. Sept. 9, 2021) (finding that a defendant's

LinkedIn and Facebook posts accusing plaintiff of sexual assault concerned "more than a purely private matter" (internal quotation marks omitted)).

In addition, Freborg provided adequate evidence of the #MeToo conversations happening about predatory behavior in the dance community, including a series of similar posts made on and around the time of her own July 14, 2020 post. Her statements fit well within the context of a legitimate social movement.[9]

Johnson cites other contextual factors to show that Freborg's posts are not a matter of public import. As noted above, he contends that his previous relationship with Freborg demonstrates that the nature of her speech was private. But the mere existence of a previous relationship is not a dispositive factor in assessing the nature of the speech, and it does not negate the importance of speaking out against sexual assault in society. Many victims who come forward to speak about their experiences of sexual assault often have a preexisting relationship with their abusers. *See, e.g.*, *Fredin*, 500 F. Supp. 3d at 763–64 (granting summary judgment to one of the women named in the plaintiff's defamation lawsuit who previously had been romantically involved with the plaintiff); *see also* Lauren R. Taylor & Nicole Gaskin-Laniyan, *Sexual Assault in Abusive Relationships*, 256 Nat'l Inst. of Just. 12, 12–14 (Jan. 2007). In Minnesota, for example, a grim statistic shows that

---

[9]     Noting its concern that the #MeToo movement can be manipulated to launch false accusations against innocent persons, the dissent references striking historical examples of the shocking violence that resulted from false interracial allegations of inappropriate behavior. It also references a more current case of false accusations, where the person making the false accusations faced criminal consequences.
    It is true that false accusations of sexual assault can cause serious harm to the person accused. It is also true that research shows that these types of false accusations of sexual assault are rare. Caitlin K. Cervenka & Christine M. Crow, *Lawyering in the #MeToo Era*, 109 Ill. B.J. 30, 31 (2021) ("[W]hile false allegations of sexual violence do occur, they are rare; studies have shown that the rate of false allegations is between 2 and 10 percent.").

one in every three women will experience violence, rape, or stalking by an intimate partner in their lifetime. *Domestic Violence in Minnesota*, Nat'l Coal. Against Domestic Violence (2020). If we were to hold that the mere existence of a previous relationship between Johnson and Freborg makes Freborg's speech private in nature, the impact would be an unnecessary chilling effect on the exercise of free speech by victims of sexual assault and their ability to effect social change.

Johnson next contends that, unlike Westboro Baptist Church and the owner of the account used to tweet about Fredin, Freborg had no prior history speaking out about the #MeToo movement or sexual abuse and harassment generally. We do not give this contention much, if any, weight. To hold that victims of sexual assault can only speak out about their experiences if they themselves are already advocates would certainly chill other alleged victims from coming forward. *See Fredin*, 500 F. Supp. 3d at 777 (noting the importance of and protecting speech that addressed "harassment and rape, and more specifically, *the subject of women coming forward to share their experiences in this regard*" (emphasis added)). Johnson's argument also fails to consider that *every* alleged victim, be they an advocate or not, must make a *first* statement. If we were to conclude that Freborg's speech was private in nature simply because she had no history of advocacy, that would discourage any person not already engaged in advocacy work from telling their story about what happened to them and adding their voice to the desire for social change because they could be liable for per se defamation.

Moreover, even with the heightened protection of the actual-malice constitutional standard, the speech of victims of sexual assault may well be chilled. Given the potential threat and costs of defending a defamation lawsuit, many victims of sexual assault may

24

choose not to speak out at all. *See* Shaina Weisbrot, *The Impact of the #MeToo Movement on Defamation Claims Against Survivors*, 23 CUNY L. Rev. 332, 352–53 (2020) (explaining that while #MeToo has empowered more people to speak out, this speech has led to more defamation lawsuits, especially if the accused has significant power or resources).

Finally, Johnson cites *Maethner* and a lack of media coverage of Freborg's posts to show that the posts concerned a private matter. *Maethner* does not *require,* however, that Freborg's speech be later disseminated by the media for it to be considered a statement of public import. There, we held that the dispositive inquiry regarding the availability of presumed damages "is not on the status of the defendant as a media or nonmedia defendant" but "whether the matter at issue is one of public concern." *Maethner*, 929 N.W.2d at 877. We later cited Eighth Circuit cases that noted that "media coverage is a good indication of the public's interest" and stressed "the importance of journalistic freedom in investigating and reporting on matters of public interest." *Id.* at 881 (citations omitted) (internal quotation marks omitted). We then noted that dissemination of statements in the news media is "one of many relevant factors in determining whether the statements involve a matter of public concern." *Id.* Our discussion in *Maethner* therefore suggests that this non-dispositive factor serves to protect journalists in traditional media by adding another consideration to identify speech on a matter of public concern. Given this background and that Freborg's posts were made on Facebook, a website that *Packingham* describes as a "powerful mechanism" for the robust exchange of views, 582 U.S. at 107, the fact that no news media reported Freborg's posts is not a decisive factor in assessing the public import of the speech.

25

After considering the context of Freborg's posts, we conclude that this factor shows that her speech involved a matter of public concern.

D.

In sum, weighing the content, form, and context of Freborg's statements in light of the whole record, we conclude that the overall thrust and dominant theme of the posts involved a matter of public concern. We therefore hold that Freborg's speech is subject to heightened protection under the First Amendment. Accordingly, to prevail on his defamation claim for presumed damages, Johnson must show that Freborg's posts not only were false, but that they were made with actual malice.

II.

Turning to the issue of actual malice, we note that the court of appeals did not rule on this issue because it held that Freborg's speech involved a matter of private concern. *Freborg*, 978 N.W.2d at 923 n.25. Nor did Freborg raise the issue of actual malice in her petition for review. Consequently, the parties agree that, if we conclude that the challenged speech here involved a matter of public concern, we should remand the case to the district court for a trial on the veracity of Freborg's speech and actual malice. We agree for the following reasons.

The district court concluded as a matter of law that the record contained insufficient evidence of actual malice. But the court of appeals held that a genuine issue of material fact existed as to the veracity of Freborg's speech, making summary judgment improper. *Id.* at 918. Given the fact issue on falsity—and because Freborg was both the speaker *and* the publisher of the alleged defamatory statements—if a jury finds that Freborg's speech was false, sufficient evidence may allow the jury to further find that Freborg made the

26

statements with actual malice.[10]  We therefore reverse the district court's ruling on actual malice and remand this case for further proceedings.

## CONCLUSION

For the foregoing reasons, we reverse the decision of the court of appeals and remand the case to the district court for further proceedings.

Reversed and remanded.

---

[10]     To succeed in a defamation case, a plaintiff must always prove that a statement is false.  We note that when the alleged sexual abuse involves a private interaction between two people, if the plaintiff shows that the allegations were false, the constitutional actual-malice standard may not pose much of an additional burden.  This is so because the standard requires that the statement be made with the "knowledge that it was false or with reckless disregard of whether it was false or not."  *Maethner*, 929 N.W.2d at 873 (citation omitted) (internal quotation marks omitted).

DISSENT

GILDEA, Chief Justice (dissenting).

In this defamation case, we are asked to decide whether heightened First Amendment protections apply to Kaija Freborg's accusation that Byron Johnson, her former dance instructor and romantic partner, "gaslighted/coerced [her] into having sex, sexual[ly] assaulted, and/or raped" her. The question is not whether Freborg's speech is protected at all; it is. Existing precedent already dictates those protections. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974) (noting that states may "not impose liability without fault"); *Jadwin v. Minneapolis Star & Trib. Co.*, 367 N.W.2d 476, 492 (Minn. 1985) (adopting negligence standard in response to *Gertz*). The narrow question here is whether Freborg's speech is so central to the purpose of the First Amendment that it is entitled to the heightened protections reflected in the constitutional actual malice standard. The majority concludes that the actual malice standard applies to Freborg's speech because Freborg wrote about sexual assault and included #MeToo in her post. I disagree. In my view, Freborg's personal Facebook post, on her personal Facebook page, concerning private conduct between two people with a private relationship, is not speech that the constitutional actual malice standard protects. Accordingly, I dissent.

A.

Historically, defamatory speech, such as allegations of criminal behavior akin to those made here, fell outside the scope of the First Amendment. *Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 328 (Minn. 2000) (noting that "defamatory comments were, by definition, not protected speech under the First Amendment."). But in

*New York Times v. Sullivan*, 376 U.S. 254 (1964), the Supreme Court said, "that the reputational interests protected by state libel law must yield when in conflict with the central meaning of the First Amendment." *Jadwin v. Minneapolis Star & Trib. Co*., 367 N.W.2d 476, 481 (Minn. 1985) (citing *New York Times*, 376 U.S. at 273–75). The *New York Times* Court adopted the actual malice standard to strike a balance between reputational interests and First Amendment protections.[1]

The majority concludes that Minnesotans' reputational interests must yield here because Freborg's speech is a matter of public concern and therefore worthy of the heightened First Amendment protection of the constitutional actual malice standard. I disagree. Providing redress for Minnesotans who have been accused by name of sexual assault does not conflict with the "central meaning of the First Amendment." *Jadwin*, 367 N.W.2d at 481. Accordingly, under Supreme Court precedent, the constitutional actual malice standard does not apply. Examination of the Court's precedent and application of the required totality of the circumstances test confirms this.

1.

Our analysis of Supreme Court precedent must begin with *New York Times*, the case in which the Court created the constitutional actual malice standard. There, the Supreme Court recognized that speech by the press that criticized public officials for their official conduct was so valuable that, even if it was defamatory, the First Amendment required that

---

[1] Under this constitutional standard, a plaintiff cannot recover damages for injury to reputation unless the plaintiff proves that the defendant made the statement at issue knowing it was false or with reckless disregard for the statement's falsity. *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964).

the speech be given some protections so that the speech was not unnecessarily chilled. 376 U.S. at 278–79. The Court created the "actual malice" standard to provide that protection—public officials may not recover damages for a defamatory falsehood relating to their official conduct unless they prove that the statement was made with "actual malice." *Id.* at 279–80. The Court grounded the result in the fact that the speech at issue— citizen commentary on the performance of their government—went to the very heart or "central meaning of the First Amendment." *Id.* at 273; *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334 (1974) (describing *New York Times* as "defin[ing] a constitutional privilege intended to free criticism of public officials from the restraints imposed by the common law of defamation").

The majority holds that this actual malice standard from *New York Times* applies to Freborg's allegation that Johnson sexually assaulted her. But the animating principle in *New York Times* was the connection of the speech to principles necessary to a successful democracy, such as the citizenry's ability to comment freely on the performance of their government. *See New York Times*, 376 U.S. at 273, 279–80. Freborg's speech has nothing whatsoever to do with the government or government officials, and nothing in *New York Times* supports the majority's extension of the actual malice standard to the speech at issue here.

The Supreme Court's jurisprudence on the actual malice standard since *New York Times* likewise does not support the majority's extension of the standard to Freborg's speech. The Court discussed the applicability of the actual malice standard in *Gertz v. Robert Welch*, 418 U.S. 323 (1974). In *Gertz*, as in *New York Times*, the speech was

grounded in commentary about government performance. *See Dun & Bradstreet v. Greenmoss Builders, Inc.*, 472 U.S. 749, 756 (1985) (noting that the speech at issue in *Gertz* "involved expression on a matter of undoubted public concern" because the article questioned whether a prosecution of a police officer was part of a Communist campaign to discredit local law enforcement agencies).

The *Gertz* Court recognized that states have a "legitimate interest" in providing compensation to people whose reputations have been harmed by defamation, and that that interest needed to be balanced against competing First Amendment considerations to ensure that speech the First Amendment values is not chilled. 418 U.S. at 348–50. When the plaintiff is a private individual, the Court concluded, the government's interest in compensating for reputational harm was greater than in the case of public official/public figure plaintiffs, such as the plaintiff in *New York Times*. *Gertz*, 418 U.S. at 343–44. The Court held that states have "substantial latitude" in providing remedies to private plaintiffs for reputational injuries and that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood." *Id.* at 345, 347. But the Court clarified that "the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." *Id.* at 349.

The Supreme Court limited *Gertz* in *Dun & Bradstreet v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985). Unlike the facts of *New York Times* and *Gertz*, *Dun & Bradstreet* involved only private, nonmedia parties: the plaintiff was a construction contractor and

defendant was a credit reporting agency. *Dun & Bradstreet*, 472 U.S. at 751. The plaintiff sued the defendant for erroneously reporting to third parties that the plaintiff had filed for bankruptcy. *Id.* at 751–52. The plurality opinion reasoned that *Gertz* applied only to speech on matters of public concern and that *Dun & Bradstreet* involved a matter of "purely private concern." *See id.* at 763 ("We conclude that permitting recovery of presumed and punitive damages in defamation cases absent a showing of 'actual malice' does not violate the First Amendment when the defamatory statements do not involve matters of public concern."). Thus, the Court allowed the plaintiff to recover presumed damages without proving actual malice.

Read together, *New York Times*, *Gertz*, and *Dun & Bradstreet* hold that the actual malice standard applies to protect speech about a public figure, government official or the performance of government more generally, but the standard does not apply to speech about a private plaintiff on a matter of private concern. *See Maethner v. Someplace Safe, Inc.*, 929 N.W.2d 868, 877–78 (Minn. 2019).[2] For the former, a plaintiff must show actual malice to recover; for the latter, state law governs. And for speech to be a "matter of public concern" sufficient to warrant application of the constitutional actual malice standard, that speech must relate to self-government. *See Dun & Bradstreet*, 472 U.S. at 759 (noting that "the role of the Constitution in regulating state libel law is far more limited when the concerns that activated *New York Times* and *Gertz* are absent"); *New York Times*, 376 U.S.

---

[2] The parties agree that there is no media defendant here as in *New York Times*, and they also agree that the parties involved are not public or government figures. Thus, the only way that the actual malice standard would apply is if Freborg's Facebook post is speech on a matter of public concern.

at 269 ("The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system."); *see also* Elena Kagan, *A Libel Story: Sullivan Then and Now*, 18 L. & Soc. Inquiry 197, 212 (1993) (noting that one approach to understanding the *New York Times v. Sullivan* line of cases is to "view[] *Sullivan* as primarily a case about the speech necessary for democratic governance").

## 2.

The majority argues that I have interpreted the Supreme Court's precedent too narrowly. For support, the majority essentially equates matters of interest to the public to those of public concern. *Supra* at 17. But the Supreme Court has already concluded that when the issue is the application of the constitutional actual malice standard, there is a dispositive difference between matters of public interest and matters of public concern. *Time, Inc. v. Firestone*, 424 U.S. 448, 454 (1975). In *Time, Inc.*, the Court made clear that not all matters of interest to the public are matters of public concern for purposes of applying the First Amendment. *See Time, Inc.*, 424 U.S. at 454, 457 (rejecting petitioner's attempt to "equate 'public controversy' with all controversies of interest to the public" and concluding the speech at issue was private speech because it "add[s] almost nothing toward advancing the uninhibited debate on public issues thought to provide principal support for the decision in *New York Times*."). And the Court confirmed that *Gertz* had "repudiated" the view that the "*New York Times* privilege should be extended to falsehoods defamatory of private persons whenever the statements concern matters of general or public interest."

*Id.* at 454; *see also Gertz*, 418 U.S. at 346 (rejecting "[t]he 'public or general interest' test for determining the applicability of the *New York Times* standard" because that test "inadequately serves both of the competing values at stake"); *cf. Waldbaum v. Fairchild Pub., Inc.*, 627 F.2d 1287, 1296 (D.C. Cir. 1980) ("A public controversy is not simply a matter of interest to the public."). *Time, Inc.* involved a news magazine article that included reports that the defendant had extramarital affairs. The Court declined to apply the *New York Times* "actual malice" standard, opting instead for the standard requiring some proof of fault from *Gertz*. *Time, Inc.*, 424 U.S. at 457; *see also id.* at 469–70 (Powell, J., concurring). In short, the Court in *Time, Inc.* continued the long line of cases including *New York Times*, *Gertz*, and *Dun & Bradstreet*, that hold that speech about governance and self-government is speech on a matter of public concern for purposes of the constitutional actual malice standard.

I acknowledge, as we have recognized in other cases, that as a general proposition speech discussing crime can be speech on a matter of public concern. *See Maethner*, 929 N.W.2d at 881 (noting that as a "general proposition" "speech relating to domestic violence involves a matter of public concern"); *Richie v. Paramount Pictures Corp.*, 544 N.W.2d 21, 25–26 (Minn. 1996) (noting that child sexual abuse is matter of public concern).[3] But Freborg was not discussing crime in general, the prevalence of crime in our

---

[3]     Importantly, neither *Maethner* nor *Richie* adopts a per se rule. In *Maethner*, we did not disagree with the "general proposition" that "speech relating to domestic violence involves a matter of public concern," but we declined to address whether the speech in that case (all of which discussed domestic violence) was speech on a matter of public concern. 929 N.W.2d at 881. Instead we noted that the district court did not reach a conclusion on the question and remanded the case to the district court for further consideration. *Id. Richie*

society, or the government's response to crime. Rather, she made a specific accusation of criminal conduct on Facebook—that a person she identified by name sexually assaulted her. Although the public may be interested in Freborg's allegations, I would hold that such speech is not a matter of public concern for First Amendment purposes. *Bierman v. Weier*, 826 N.W.2d 436, 462 (Iowa 2013) (holding that book author's allegation that identified person committed sexual assault was not a matter of public concern for First Amendment purposes); *W.J.A. v. D.A.*, 43 A.3d 1148, 1157–58 (N.J. 2012) (holding that defendant's speech on website he created where he alleged that his uncle sexually abused him was not a matter of public concern).

The majority disagrees but it makes no real attempt to connect Freborg's Facebook post to commentary that goes to an issue important to self-government or to the "central meaning of the First Amendment." *See New York Times*, 376 U.S. at 273; *see also Jadwin*, 367 N.W.2d at 481. Instead, the majority focuses its analysis on how the broader MeToo movement related to social change. I acknowledge the important contributions the MeToo movement has made to our society. But this case is not about the MeToo movement; it is about a Facebook post where Freborg accused Johnson of sexual assault and then included "#MeToo." We are tasked with evaluating whether Freborg's *single* Facebook post was speech on a matter of public concern, not the entire MeToo movement. Moreover, the majority cannot connect Freborg's post to any particular change in statute, nor do the

_____

involved media defendants, which is a material difference to application of the constitutional actual malice standard. *Richie v. Paramount Pictures Corp.*, 544 N.W.2d 21, 23 (Minn. 1996). In short, we did not hold in either case that speech about sexual abuse and harassment is always entitled to First Amendment protection. *See supra* at 17.

changes to federal law cited by the majority—changes that concern settlement, arbitration, and nondisclosure—even apply to this case. The focus of those changes is apparently on workplace sexual assault and harassment, and has nothing to do with sexual violence committed at a private party between people with a personal relationship who met through a hobby.[4]

The majority also supports its focus on the importance of the MeToo movement generally with statistics that show the prevalence of sexual violence and domestic abuse against women. *Supra* at 22–24. This reliance on statistics and the MeToo movement generally reveals a values-based approach to applying the First Amendment that is not consistent with the First Amendment's prohibition on "viewpoint discrimination." *See R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 383–84, 391 (1992) (noting that unprotected categories of speech "can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content* (obscenity, defamation, etc.)—not that they are categories of speech entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content"). I see no reason to apply the First Amendment differently in the MeToo context.

---

[4] For similar reasons, the majority's reliance on statistics about the increase in Equal Employment Opportunity Commission complaints and the fact that "people who commit sexual harassment or assault in the workplace are now more likely to be held responsible for their actions" are misplaced. *See supra* at 22; Anna Brown, *More Than Twice as Many Americans Support Than Oppose the #MeToo Movement,* Pew Rsch. Ctr. 4 (Sept. 29, 2022). Freborg's speech was not about workplace sexual violence.

3.

*Snyder*, a case about intentional infliction of emotional distress—not defamation—does not compel a contrary conclusion. *Anthony List v. Dierhaus*, 779 F.3d 628, 632 (6th Cir. 2015) (observing that *Snyder* was not a defamation case and suggesting that *Snyder* was of limited application to defamation cases).[5]

In *Snyder*, the U.S. Supreme Court held that a claim for intentional infliction of emotional distress will not lie in the face of a First Amendment challenge when the allegedly distress-causing conduct is speech about a matter of public concern. Speech intended to inflict emotional distress does not fall into the category of speech that was

---

[5] In *Maethner,* we said that the test discussed in *Snyder*, which looks at the form, content, and context for the alleged tortious activity, should be considered but that no one factor was dispositive and that our test would require an examination of the totality of the circumstances to decide whether the actual malice standard applied. 929 N.W.2d 881. The majority's focus on the *result* in *Snyder* to compel a result in this case is not consistent with that direction.

The majority also cites three cases to support its reliance on *Snyder* to compel the result here. *Supra* at 17–18 (citing *Dongguk Univ. v. Yale Univ*. 734 F.3d 113 (2d Cir. 2013), *Cousins v. Goodier*, 283 A.3d 1140 (Del. 2022), and *Monge v. Univ. of Pa.*, ___ F. Supp. 3d ___, No. CV22-2942, 2023 WL 3692935 (E.D. Pa. May 26, 2023)). These cases are inapposite. *Dongguk* is of no help because the defendant in that case "concede[d] that the defamatory statements addressed public figures and matters of public concern." 734 F.3d at 122. And the court's use of *Snyder* was confined to the negligence claim stated in the complaint. In other words, unlike the majority here, the Second Circuit in *Dongguk* did not use *Snyder* to resolve the plaintiff's defamation claim. *Id*. at 127. *Cousins* is likewise unhelpful to the majority because *Cousins*, like *Snyder*, is not about the actual malice standard in a defamation case. The defamation claim in that case was dismissed because the plaintiff could not prove that the alleged defamatory statement was false. 283 A.3d at 1160. And *Monge* involves a media defendant and criticism of a university professor's performance. 2023 WL 3692935, at *1. The court did not use *Snyder* to compel a conclusion on the application of the constitutional actual malice standard (which is what the majority does here). *Id*. at *3. Rather, the court relied on *Snyder*'s public-concern analysis for the proposition that the plaintiff had to prove falsity, something that is not at issue here. *Id*.

historically unprotected by the First Amendment, whereas defamatory speech does. *See Snyder*, 562 U.S. at 451 n.3. This makes the State's interest in preserving a cause of action weigh more heavily here than in *Snyder*, and the First Amendment interest in protecting speech weigh less. *Maethner*, 929 N.W.2d at 870–71 (noting that the purpose of the content, form, and context inquiry is "to strike a delicate balance between the State's interest in providing redress for citizens claiming reputational injury and the free speech protections the First Amendment provides").

Another important distinction between defamation and intentional infliction of emotional distress also influenced the Court's analysis in *Snyder*. An element of intentional infliction of emotional distress is the outrageousness of the conduct. But outrageousness can have important value to speech, and permitting liability based on the "outrageousness" of speech permits juries to discriminate on speech based on its content or the viewpoint conveyed. *See Snyder*, 562 U.S. at 458 (" 'Outrageousness,' however, is a highly malleable standard with an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression.") (citation omitted) (internal quotation marks omitted)). The Court found the risk of chilling speech based on a malleable standard of outrageousness "unacceptable" because " 'in public debate [we] must tolerate insulting, and even outrageous, speech in order to provide adequate "breathing space" to the freedoms protected by the First Amendment.' " *Id.* (citing *Boos v. Barry*, 485 U.S. 312, 322 (1988)). In other words, it was important to the Court's analysis that the

outrageousness element of the tort of intentional infliction of emotional distress risked a jury verdict on the basis of jurors' opinions and subjective judgments.

That risk is much lower in a defamation case. In a defamation case, a jury will consider the content of the speech only to evaluate its truth or falsity. Unlike the intentional-infliction-of-emotional-distress context, the jury in a defamation case cannot impose liability based on their own subjective judgments about the outrageousness of the speech.[6]

Finally, regarding the relevance of *Snyder* to the result here, the Court said in *Snyder* that it was writing a "narrow" holding, one "limited by the particular facts" of *Snyder*. 562 U.S. at 460. The case did not even discuss the constitutional actual malice standard,

---

[6]     The majority disagrees that the cause of action affects our application of *Snyder*, arguing that the "form, content, and context" test should apply in exactly the same way in an intentional infliction of emotional distress case as in a defamation case. *See supra* at 17 n.4. The reason for the "form, content, and context" inquiry is "to ensure that courts themselves do not become inadvertent censors." *See Snyder*, 562 U.S. at 452. And the risk of becoming inadvertent censors turns on the cause of action. *See id.* at 458 (balancing the First Amendment against the state's interest in preserving a cause of action for "outrageous" speech). The touchstone of the test in a defamation case is balancing the First Amendment protections against the state's interest in preserving a cause of action for damage to reputation, whereas the touchstone in an intentional infliction of emotional distress case is balancing the First Amendment with the state's interest in maintaining a cause of action for infliction of emotional distress. *See id.* at 462–63 (Breyer, J., concurring) ("To uphold the application of state law in these circumstances would punish Westboro for seeking to communicate its views on matters of public concern without proportionately advancing the State's interest in protecting its citizens against severe emotional harm."). The cause of action necessarily affects the balance.

and the majority is unable to explain how a case that does not even mention the standard compels the conclusion that the standard applies here.[7]

4.

Even though *Snyder* cannot compel the result here, we have recognized that analyzing the form, content, and context of the speech, as the Court did in *Snyder*, can be a helpful piece of the totality of the circumstances analysis. *Maethner*, 929 N.W.2d at 881.

i.

The "form" asks where the speech occurred. The parties agree that the speech here occurred on a social media platform that was publicly viewed by many people, and that the use of a hashtag made the post more accessible to the public.[8] The fact that the speech was made in a "modern public square" is a relevant consideration in assessing whether the speech is deserving of First Amendment protection. *See Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). But it is not dispositive. Indeed, even though the speech at issue in *Time, Inc.* appeared in a national news magazine, the Supreme Court held that the speech did not rise to the level of warranting First Amendment protection. *Time, Inc.*, 424 U.S. at 457.

---

[7] *Snyder* is, as the majority notes, more recent than *New York Times Gertz,* and *Time, Inc*. *Supra* at 17. But nothing in *Snyder* can be fairly read as modifying the analysis courts should follow for application of the constitutional actual malice standard, a standard that was not even mentioned in the case.

[8] The majority considers Freborg's use of #MeToo as relevant to the form, content, and context of her post. I consider it relevant only to form.

D-13

Turning next to the "content" of Freborg's Facebook post, I conclude that the "overall thrust and dominant theme" of Freborg's Facebook post was to accuse Johnson of sexual violence. *Maethner*, 929 N.W.2d at 880–81. Specifically, Freborg identifies Johnson and two others by name, accuses them of sexual violence, and speaks directly to them in her post. She also "tags" Johnson in the post, which made sure that her post would be linked to him through his own Facebook presence. By tagging Johnson in the post, Freborg further confirms that Johnson—and not some broader societal issue—is the target of her speech.

But, according to the majority, the thing that separates Freborg's Facebook post from any other speech accusing another of sexual assault is that Freborg included #MeToo (and to a lesser extent, #DancePredators), which shows that she intended to participate in a hashtag-based social movement.[9] I disagree.

While use of a hashtag makes the post available more broadly to the public, it does not change the overall thrust of Freborg's speech. Freborg's speech included #MeToo, but the post made no mention of government policy changes or systemic problems. Moreover, the content of Freborg's speech was disconnected from the MeToo movement. Unlike the

---

[9] The majority also states that "attaching a hashtag—even the well-recognized #MeToo . . . is not in and of itself determinative of whether the speech involves a matter of public concern." But this characterization misrepresents the majority's analysis. The only thing the majority points to as connecting Freborg's post to a movement is #MeToo, and the matter of public concern that the majority cites to is "sexual assault in the context of the #MeToo movement." In other words, the matter of public concern is the MeToo movement and the connection to the MeToo movement was Freborg's use of #MeToo. So it seems that in this case at a minimum, the use of a hashtag was determinative.

individual defendant in *Maethner*, Freborg did not include generalized education about crime, a general call to action, or highlight her work with an advocacy organization relevant to the MeToo movement. *See Maethner*, 929 N.W.2d at 871–72 (describing posts). Instead Freborg focused on allegations of criminal conduct against her, stating "I've been gaslighted/coerced into having sex, sexual[ly] assaulted, and/or raped by the following dance instructors . . . " Johnson is specifically identified by name and Freborg accuses him of sexual violence against her. Freborg even speaks directly to Johnson and the other alleged perpetrators, saying, "If *you* have a problem with me naming *you* in a public format, then perhaps *you* shouldn't do it." (Emphasis added.) Freborg's own words make clear that the overall thrust of her speech was to call out private people for private behavior.

iii.

Finally, I consider the context of Freborg's post. The context of Freborg's post is the subject of much debate in this litigation. The majority places Freborg's post in the context of the MeToo movement. The majority acknowledges that Freborg and Johnson had a prior personal relationship but dismisses that because the relationship ended years earlier, and so, the majority concludes, Freborg's intent was not to level a "personal attack" against Freborg. *See Snyder*, 562 U.S. at 455.

While I agree with the majority that parts of Freborg's speech are connected to the MeToo movement in the sense that she included #MeToo in her post, the context of her post was personal. The record reflects no history from Freborg of speaking out against sexual violence. She and Johnson knew each other through the dance community, which Freborg's counsel admitted during oral argument was a "hobby." Freborg's post does not

implicate Johnson's public or workplace conduct, but his conduct at a private party. And

Freborg and Johnson had a prior personal relationship.[10] In this litigation, Freborg asserted

that at various times during their relationship Johnson requested to have unprotected sex,

then had sex with other women after they agreed to be monogamous, gave Freborg a

sexually transmitted disease, blamed Freborg for giving him a sexually transmitted disease,

laughed at Freborg, called her dumb, and suggested she "made it all up in her head."

Regardless of whether the purpose of Freborg's post was to mount a "personal attack" or

to participate in the MeToo movement, there is an undeniable personal element to the

Facebook post at issue here, and the personal nature of the dispute permeates this litigation.

Moreover, even accepting that Freborg's post occurred in the context of the MeToo

movement, her post is different from the protest in *Snyder*. In *Snyder*, the speech at issue

---

[10]      I do not "mechanically characterize the matter as one of private concern" based on the nature of Freborg and Johnson's relationship. Instead I consider it a factor in the totality of the circumstances analysis that the First Amendment commands. Because this is a totality of the circumstances analysis, I agree with the majority that "the mere existence of a previous relationship is not a dispositive factor in assessing the nature of the speech." And I acknowledge that sexual violence often occurs between people with preexisting relationships. But the fact that perpetrators of sexual violence often have relationships with their victims does not mean that we should ignore the personal relationship between Freborg and Johnson in our analysis of whether the speech was on a matter of public concern in a defamation case.

The existence of a prior relationship, while perhaps commonplace in this specific type of defamation case, is still important to consider in our analysis. We must consider all of the facts—this is a balancing test that weighs First Amendment interests against the State's interest in providing a remedy for damage to reputation. *See Gertz*, 418 U.S. at 341 ("The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood. We would not lightly require the State to abandon this purpose, . . . the individual's right to the protection of his own good name 'reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.' " (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966) (Stewart, J., concurring opinion))).

was the entire protest. Snyder's father sued the protest organizer, the participants of the protest, and the Westboro Baptist Church for *the protest*.[11] *Snyder*, 562 U.S. at 448–49 (noting that the Westboro Baptist Church was the defendant, and that the church "frequently communicates its views by picketing"). If the MeToo movement is an online protest, then the proper parallel for the Westboro Baptist Church's protest is the entire MeToo movement—Freborg's individual post is akin to one protester holding just one sign. The *Snyder* court even suggested that some of the individual signs might be private speech if they were viewed standing alone. *See Snyder*, 562 U.S. at 454 ("[E]ven if a few of the signs—such as "You're Going to Hell" and "God Hates You"—were viewed as containing messages related to Matthew Snyder or the Snyders specifically, that would not change the fact that the overall thrust and dominant theme of Westboro's *demonstration* spoke to broader public issues." (emphasis added)).

The context of the speech is also different from *Richie* and *Maethner*, which were cases involving media or advocacy organizations. Freborg, in contrast, is not a member of the media and she did not post on a public Facebook page for an advocacy organization with a mission to help victims of domestic violence. She is a private person posting on her personal Facebook page. *See Richie*, 544 N.W.2d at 26 (noting that the defendants were members of the media); *Maethner*, 929 N.W.2d at 871 (involving speech by an advocacy organization).

---

[11]    In its discussion of *Snyder v. Phelps*, the majority suggests that only the leader of the Westboro Baptist church, the man who organized the protest, was a party to the lawsuit. But Snyder sued the leader, his daughters (who participated in the protest), and the church. *See Snyder*, 562 U.S. at 449–50.

In sum, Freborg was a private person, leveling an allegation of private conduct at a private event, against a person with whom she had a personal relationship, all on her personal Facebook page—a page with no history of discussing issues of sexual violence. Consistent with the animating principle from the Supreme Court, we should not apply the actual malice standard to Freborg's speech because it does not fall within the central purpose of the First Amendment. The majority disagrees, but it has not cited a case where a court has applied the constitutional actual malice standard to speech where a private individual accuses an identified person of a crime in a private social media post that includes a hashtag.[12]  Considering the form, content, and context of Freborg's speech, I

---

[12]     The majority describes *Fredin v Middlecamp*, as "a recent defamation case with similar facts." *See supra* at 18 (citing 500 F. Supp. 3d 752, 777, 798 (D. Minn. 2020), *aff'd*, 855 F. App'x 314 (8th Cir. 2021) (per curiam) (unpublished)).  But in *Fredin*, two defendants had secured harassment restraining orders against the plaintiff and a third defendant reported about those harassment restraining orders on a social media account. 500 F. Supp. at 760; *see Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975) (concluding that the First Amendment precludes states from imposing civil liability based on the publication of true information in public, official court records); *Quigley v. Rosenthal*, 327 F.3d 1044, 1060 (10th Cir. 2003) (noting that "the existence of a civil lawsuit" is a "relevant factor" to reviewing whether speech concerns a matter of public concern).  The social media account in *Fredin* was generally dedicated to addressing "subjects of online and real life misogyny, harassment, [and] rape culture." *Fredin*, 500 F. Supp. 3d at 770 (internal quotation marks omitted).  And the media reported on the social media posts.  In short, *Fredin* is a markedly different case in that it involved accusations made in public judicial proceedings that were reported in the media.  Here, by contrast, the accusations are made in a personal social media post.
      The anti-SLAPP cases that the majority relies on likewise do not compel the result majority reaches. *See Fells v. Serv. Employees Int'l Union*, 281 A.3d 572, 581 (D.C. App. 2022) (noting a statutory definition for public interest); *Goldman v. Reddington*, No. 18-CV-3662RPKARL, 2021 WL 4099462 (E.D.N.Y. Sept. 9, 2021); *Dossett v. Ho-Chunk, Inc.*, 472 F. Supp. 3d 900 (D. Or. 2020); *Coleman v. Grand*, 523 F. Supp. 3d 244 (E.D.N.Y. 2021).  Although these laws incorporate the constitutional standard under the First Amendment to some extent, anti-SLAPP laws are state statutes, and cases interpreting state statutes are distinguishable on that ground alone. *See, e.g.*, *Fells*, 281 A.3d at 581 (noting

would hold that her speech is not a matter of public concern. *See Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 794 (7th Cir. 2016) ("While none of the three factors is dispositive, content is the most important.").

B.

Ultimately, as we have recognized, the question of public concern is based on the totality of the circumstances, and the purpose of the analysis is to balance the state's interest in preserving a cause of action for damages to reputation against preserving speech the First Amendment values. *Maethner*, 929 N.W.2d at 881; *Gertz*, 418 U.S. at 343–44. One of the circumstances that must be considered is the consequences of embracing the broad hashtag rule that the majority writes. *See Snyder*, 562 U.S. at 452 (explaining that "the boundaries of the public concern test are not well defined" and that the form, content, and context test and standards articulated by the Supreme Court are "guiding principles"

---

that the statute "defines '[i]ssue of public interest' as 'an issue related to health or safety; environmental, economic, or community well-being; the District government; a public figure; or a good, product, or service in the market place.' "); *Coleman*, 523 F. Supp. 3d at 259 (explicitly stating that New York law defines public concern broadly, as "a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants" (citation omitted) (internal quotation marks omitted)). These cases do not purport to interpret the First Amendment and are therefore not helpful here. Moreover, many of these cases involve direct criticism of government actors or public persons, making the speech at issue in these cases akin to that at issue in *New York Times*. *See Goldman*, 2021 WL 4099462, at *4 (also applying New York's broad definition of "matter of public concern" and noting that the defendant's speech included "extensive criticism of the law enforcement investigation of her sexual-assault complaint"); *Dosset*, 472 F. Supp. 3d at 908 (explaining that the speech at issue concerned "alleged workplace misconduct by the highest-ranking legal officer of the oldest and largest organization of American Indian and Alaska Native tribal governments"); *Fells*, 281 A.3d at 584 (concluding that plaintiff was a public figure because he "voluntarily thrust" himself into the debate on sexual harassment as the workplace as "interim President of the National Fast Food Workers' Union").

(citation omitted) (internal quotation marks omitted)). Applying the majority's rule, any speech that includes a hashtag is a matter of public concern and subject to the heightened actual malice standard. This is troubling.[13]

Minnesota has a long and deep history of recognizing and protecting reputational interests. *See Maethner*, 929 N.W2d at 875 ("We have recognized that 'personal reputation has been cherished as important and highly worthy of protection' throughout history." (quoting *Jadwin*, 367 N.W.2d at 491)). The reasons for protecting reputational interests extend beyond financial compensation, because defamation can also cause "personal humiliation, and mental anguish and suffering." *See Time, Inc.*, 424 U.S. at 460; *see also Richie*, 544 N.W.2d at 28 ("[E]motional damages are not compensable absent harm to reputation."). We should not be so quick to abandon this history.

Important in our consideration of Minnesota's history of protecting reputational interests is an acknowledgement that false accusations of rape and sexual assault have been used as a weapon to damage reputation and sometimes—even in recent history—resulted in death or wrongful imprisonment.[14] *See* Mark Curriden & Leroy Phillips, Jr., *Contempt*

---

[13]    For example, under the majority's rule of law, a father who accuses the mother of his children of child abuse on social media using #FathersRights in his post would have the benefit of the actual malice standard.

[14]    The majority suggests that reputational interests are less important in the context of sexual assault allegations because "research shows that these types of false accusations of sexual assault are rare." *Supra* at 23 n.9. Then the majority cites to Caitlin K. Ceryenka & Christine M. Crow, *Lawyering in the #MeToo Era*, 109 Ill. B.J. 30, 31 (2021) for the proposition that "while false allegations of sexual violence do occur, they are rare; studies have shown that the rate of false allegations is between 2 and 10 percent." In turn, Ceryenka & Crow cite to David Lisak et al.'s article *False Allegations of Sexual Assault: An Analysis of Ten Years of Reported Cases*, 16 Violence Against Women 1318 (2010).

*of Court* 36, 166 (1999) (discussing historic inequality in discussion and prosecution of rape); Hon. Victoria A. Roberts, *The Scottsboro Boys*, 80 Mich. Bar J. 62, 62–64 (explaining that, in 1931, nine young Black men were falsely accused of raping two white women on a train; eight of the boys were tried and sentenced to death); *Alexander v. Oklahoma*, 382 F.3d 1206, 1211–12 (10th Cir. 2004) (discussing the Tulsa Race Riot, a 24-hour riot in 1921 that left as many as 300 people dead and was prompted by a rumor that a Black man assaulted a white woman); Julianne McShane, *Stanford University Employee Charged with Making 2 False Sexual Assault Allegations*, NBC News (Mar. 16, 2023, 3:02 PM), https://www.nbcnews.com/news/crime-courts/stanford-university-employee-charged-making-2-false-sexual-assault-all-rcna75264 (discussing a complaint that alleged the defendant "twice made false accusations of rape against someone matching

---

Lisak et al. conducted a review of the number of women who falsely reported sexual assaults *to the police* at "a major university in the Northeastern United States" and concluded that approximately 6 percent of the cases reported to police were demonstrably false. Lisak at 1327, 1329–30. Lisak went on to conclude that a fair estimate of the number of false reports of sexual assault made *to police* was somewhere between 2 and 10 percent. Freborg's Facebook post is not akin to a report to a police officer. *Id.* at 1330. A person reporting sexual assault to a police officer faces more barriers than someone posting to Facebook, and presumably expects an investigation. Thus the majority's assertion that "false accusations are rare" and therefore unimportant is unsupported by any *relevant* citation.

More to the point, even accepting that false reports may be uncommon, the infrequent nature of false report crimes does not diminish the importance of preserving a civil action to protect reputational interests when falsely reported crimes do occur. This is particularly so if the truth or falsity of the allegation is an element of the cause of action. I have faith in the ability of Minnesota juries to carefully consider defamation cases involving accusations of sexual violence. We do not need to extend First Amendment protection to all speech accusing anyone of a crime that uses a hashtag. As discussed above, the Supreme Court's First Amendment precedent does not command the majority's result, and we should be cautious in adopting such a sweeping rule of law.

the description of a Black male co-worker"); *see also* Samuel R. Gross et al., *Race and Wrongful Convictions in the United States 2022*, Nat'l Registry of Exonerations 18 (Sept. 2022) ("Two thirds of those misidentified rape defendants were Black men, most of whom were misidentified by white victims."); Amanda Holpuch, *4 Black Men Exonerated in False Case of Rape in '49*, N.Y. Times, Nov. 23, 2021, at A15 (noting that four Black men were falsely accused of rape in Florida in the late 1940's, and that one was killed by a mob and one was fatally shot by law enforcement).[15]

It is also important to recall that the constitutional actual malice standard was born out of concern for chilling speech about government, speech that is essential to the vibrancy of our democracy.[16] *New York Times*, 376 U.S. at 265–83; *Maethner*, 929 N.W.2d at 877–78. Freborg's accusation that Johnson raped her comes nowhere close to such speech. And a consequence of the majority's hashtag rule will likely be more posts like hers—posts accusing others of violence and bad behavior. In some circumstances, posts on social media that single out and accuse others of wrongdoing go by another name: cyberbullying.

---

[15] None of this analysis is intended to suggest that Freborg herself is lying. I agree with the majority that the truth or falsity of Freborg's statements is a question for the jury. I share this history only to emphasize that the State's interest in protecting reputation is serious—it can have life-or-death and life-or-liberty consequences. Accordingly, we ought to proceed with caution in extending First Amendment protection to statements that accuse others of crimes.

[16] I agree with the majority that sexual assault and sexual violence are societal problems and that crimes of violence against women are underreported. What I fail to see is why this problem requires us to extend additional First Amendment protection to Freborg's Facebook post accusing a particular person of a particular instance of sexual violence. The majority's statistics show that crime happens; the statistics do not show that speech about rape, sexual assault, and sexual violence are uniquely entitled to First Amendment protection.

*See What Is Cyberbullying*, stopbullying.gov, https://www.stopbullying.gov/cyber bullying/ what-is-it (last updated Nov. 5, 2021) ("Cyberbullying includes sending, posting, or sharing negative, harmful, false, or mean content about someone else. It can include sharing personal or private information about someone else causing embarrassment or humiliation."). We should not lightly open the floodgates for more speech like this— especially because one in five teenage girls experience cyberbullying, and medical experts agree that cyberbullying is one of several factors contributing to a mental health crisis among teenagers. Azeen Ghorayshi & Roni Caryn Rabin, *Teen Girls Report Record Levels of Sadness*, N.Y. Times, Feb. 14, 2023, at A16; *see also The Relationship Between Bullying and Suicide*, CDC (Apr. 2014) (discussing the link between bullying and adolescent mental health). Earlier this year, the U.S. Surgeon general noted a need for greater protections for children, including government regulations on social media companies. *See* U.S. Surgeon General, *Social Media & Youth Mental Health: The U.S. Surgeon General's Advisory*, U.S. Dep't of Health and Hum. Servs. (2023). By extending broad First Amendment protection to Freborg's Facebook post—and especially by basing this extension primarily on the use of hashtags—the majority unnecessarily restricts the government's ability to address the growing cyberbullying crisis. *Cf. New York Times*, 376 U.S. at 277 ("What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel.").

This is not to say that Freborg's speech should be left entirely unprotected—and it is not. Historically, a defendant in a defamation per se case needed to prove that the statements at issue were true. *See* Matthew L. Schafer, *In Defense: New York Times v.*

*Sullivan*, 82 La. L. Rev. 81, 114 (2021) ("While the rule prevailing at common law was that even truth was no defense to a libel, . . . cases show early courts realizing that for a republican government to be successful, some of the more draconian aspects of libel law had to be relaxed."). The burden now rests with the plaintiff to prove falsity. *Richie*, 544 N.W.2d at 25. And, consistent with *Gertz*, even in the context of defamation per se, the plaintiff must prove that the defendant was negligent in making the defamatory speech. *See Gertz*, 418 U.S. at 347 ("[S]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."); *Jadwin*, 367 N.W.2d at 492 (adopting a simple negligence standard in response to *Gertz*). In other words, Johnson must prove that Freborg's accusation was false and that Freborg did not act with reasonable care when she falsely accused him of sexually assaulting her.

## C.

Based on the totality of the circumstances here, I would hold that the actual malice standard does not apply to Freborg's speech. Freborg posted on her personal Facebook account that a person she identified by name raped her. Freborg and Johnson knew each other personally, they first met through a personal hobby, they had a personal and private sexual history, and the speech at issue here accuses another of a crime. The mere fact that Freborg made these allegations amid a social movement and included #MeToo in her post

does not convert her otherwise private speech into speech on a matter of public concern entitled to heightened First Amendment protection.  Accordingly, I dissent.

ANDERSON, Justice (dissenting).

I join in the dissent of Chief Justice Gildea.

HUDSON, Justice (dissenting).

I join in the dissent of Chief Justice Gildea.

# ATTACHMENTS

# Stanford University employee charged with making 2 false sexual assault allegations

In what the DA called a "rare and deeply destructive crime," Jennifer Gries was arrested and accused of lying about being attacked by someone matching the description of a Black male co-worker.



—— Stanford students demanded expanded safety measures last fall after two rapes were reported. The DA now says the reports were false. David Madison / Getty Images file

March 16, 2023, 3:02 PM CDT

**By Julianne McShane**

A Stanford University employee was arrested Wednesday on charges of lying to authorities about two alleged incidents of rape that she claimed occurred on the California campus, prosecutors said.

According to the complaint, obtained by NBC News, Jennifer Gries, 25, of Santa Clara, was arrested on two felony counts of perjury and two misdemeanor counts of inducing false testimony after an investigation found that she twice made false accusations of rape against someone matching the description of a Black male co-worker, in what Santa Clara County District Attorney Jeff Rosen called a "rare and deeply destructive crime."

The false assault reports – which did not identify Gries by name – "triggered campus wide safety alerts and campus unrest," the DA's office said. They also spurred national media coverage, including by NBC News, which covered the two false assault reports, as well as a student-led protest on the campus in October after the second false report.

"These false reports are damaging, both for true survivors of sexual assault and for the members of our community who experienced fear and alarm from the reports," Stanford officials said in a statement Wednesday, noting that evidence shows false reports of sexual violence are extremely rare.

Indeed, research has shown that false reports make up 2% to 8% of sexual assault reports, according to the National Sexual Violence Resource Center. And Black men in particular have long been falsely accused of sexual assault. Five Black and Latino teenagers, for instance, were wrongly imprisoned for six to 13 years for the 1989 rape of a white jogger in New York City's Central Park before their convictions were thrown out in 2002.

"Sexual assault and other sexual offenses regrettably continue to be prevalent both at Stanford and in our broader society. Our steadfast commitment to provide compassionate support for survivors of sexual assault and to prevent these acts from occurring in the first place remains unabated," Stanford's statement continued.

The university's Public Safety Department spent more than $300,000 investigating the false reports and hiring outside security, according to the probable cause document.

Gries, who works in the university's Housing Services Department, has been released on $25,000 bail, and an arraignment is scheduled in San Jose for April 17, a DA's spokesperson said.

She could face five years in jail if she is convicted, the spokesperson said.

It was not immediately clear whether she has a lawyer. Gries did not immediately respond to texts and emails at the contacts listed under her name Wednesday morning.

According to a LinkedIn profile under her name, she has worked at Stanford since August 2020 – first as a front-desk assistant and most recently as a Housing Service Centers supervisor.

Gries is on a leave of absence, officials said in the statement released Wednesday, adding that they will be "reviewing her employment in light of the information shared" by the DA's office.

A university spokesperson did not respond to questions about whether the falsely accused co-worker is still employed.

## Two false reports in two months

Gries first told county sexual assault forensic examination nurses at Santa Clara Valley Medical Center on Aug. 9 that she had been attacked by a Black man in his late 20s in a bathroom near Stanford's Wilbur Hall, according to the DA's office. It said that she alleged that she did not want to contact law enforcement and that the perpetrator was an "unknown assailant."

After she saw the subsequent campus safety alert, Gries reached out to the Stanford Public Safety Department to speak with a detective about the criminal process. When they met Aug. 17, she "refused to disclose any more details about the alleged sexual assault" but said she knew the alleged perpetrator and did not believe the public was in danger. She also asked the detective "whether human resources would be notified of this report" and "said she did not expect a community alert or for the incident to be in the news," the probable cause document says.

The detective told her the university had received "numerous questions from concerned parents of students at Stanford about whether the campus is safe."

Less than two months later, on Oct. 7, Gries again reported to a sexual assault forensic examination nurse at Stanford Hospital that she had been raped on campus – this time, she alleged, by a Black man in his late 20s in a basement storage closet.

**Recommended**



NBCBLK

**Tinashe says music label forced her to record single with R. Kelly**



OUT NEWS

**A mausoleum for transgender women is inaugurated in Mexico's capital as killings continue**

In both cases, the probable cause document says, she signed a consent form acknowledging the nurses were mandated reporters who had to notify law enforcement about the reported sexual assaults and that they would submit her name to law enforcement along with a suspicious injury report. That led to the two misdemeanor charges of inducing false testimony, the complaint says.

Both of Gries' sexual assault examination kits "were analyzed as priority rushes given the extreme public safety risk of a potential sex offender," the DA's office said. According to the probable cause document, "the lab reports showed no male DNA detected in the genital or oral areas" for both rape kits.

Evidence revealed that "Gries made up the stories due to being angry at a co-worker," the DA's office said, adding that she twice applied under penalty of perjury for funds from the California Victim of Crimes Board – which reimburses crime-related expenses – attesting that she had been sexually assaulted. She did not receive funds from the entity, a spokesperson for the DA said.

## 'Can't I just make his life a living hell'

An investigation by the Stanford Public Safety Department revealed that Gries had made a sexual harassment complaint against a co-worker who fit the description of the alleged rapist – a Black male in his 20s – last March and that a human resources investigation found the complaint was unsubstantiated, according to the probable cause document. She was subsequently moved to a different location at work, it says.

The investigation also concluded that she had told an acquaintance she was in a relationship with that co-worker, that he had sexually assaulted her and that she had become pregnant with twins before she suffered a miscarriage.

But Gries had not actually been pregnant, the investigation concluded. And texts between her and the acquaintance showed that Gries discussed the co-worker's allegedly sexually assaulting her, blaming herself for the alleged assault and saying, "Can't I just make his life a living hell myself," according to the probable cause document.

On Nov. 3, Gries again met with the same Stanford Public Safety Detective she previously spoke with and "confirmed that she personally knew the assailant." She also "asked what would happen if she provided a name," and the detective said "she would speak to that person and to other people who knew both of them," the probable cause document says.

When the detective told Gries she already knew who was being described, Gries "became visibly distraught, hyperventilated, and fanned herself" before she said "she needed air and started to cry." She left and later texted the detective that she was going to the emergency room because she felt overwhelmed, the probable cause document says.

On Jan. 24, Gries met with the detective again and "admitted to lying about the rapes and wrote an apology letter to the target of the false allegations who was the same person as the HR investigation, the victim," according to the probable cause document.

"She stated she was upset with the victim because she felt he gave her 'false intention' and turned her friends against her," it says.

In an interview with authorities, Gries' co-worker "denied any sexual or romantic contact" with her and said the HR investigation left him "scarred" and caused extreme stress while he was caring for his sick mother, who later died. He also provided evidence supporting where he said he was at the time of the alleged assaults, and he provided a swab for DNA analysis, according to the probable cause document.

He told authorities the false accusations had left him feeling "disgusting."

"I don't feel human. I don't feel human at all," he said, according to the probable cause document.

## Students react

Sexual violence prevention advocates on campus said the false reports should not distract from the prevalence of sexual violence at Stanford.

"This instance of an unfounded allegation does not change the fact that 40% of women-identified undergraduate students at Stanford will be sexually violated during their time on campus," Sexual Violence Free Stanford, a student-led advocacy group, said Wednesday on Instagram, referring to the findings of a 2019 survey.

"Not only do large percentages of on-campus sexual violence go unreported, but false reporting rates of sexual violence are nearly always comparable to – if not lower than – those of other

crimes," it added.

Julianne McShane

Madelyn Urabe contributed.

**Sponsored Stories**

by Taboola

ENDING GIFTS

re Are 29 of the Coolest Gifts for This 2023

Click Here

ASSMATES

ok For Any High School Yearbook, It's Free

NDOW HANGING PANELS

e Perfect Gift For Any Occasion!


**stopbullying**.gov

Home  »  Cyberbullying  »  What Is Cyberbullying

# What Is Cyberbullying

Cyberbullying is bullying that takes place over digital devices like cell phones, computers, and tablets. Cyberbullying can occur through SMS, Text, and apps, or online in social media, forums, or gaming where people can view, participate in, or share content. Cyberbullying includes sending, posting, or sharing negative, harmful, false, or mean content about someone else. It can include sharing personal or private information about someone else causing embarrassment or humiliation. Some cyberbullying crosses the line into unlawful or criminal behavior.

The most common places where cyberbullying occurs are:

- Social Media, such as Facebook, Instagram, Snapchat, and Tik Tok
- Text messaging and messaging apps on mobile or tablet devices
- Instant messaging, direct messaging, and online chatting over the internet
- Online forums, chat rooms, and message boards, such as Reddit
- Email
- Online gaming communities

# Special Concerns

With the prevalence of social media and digital forums, comments, photos, posts, and content shared by individuals can often be viewed by strangers as well as acquaintances. The content an individual shares online – both their personal content as well as any negative, mean, or hurtful content – creates a kind of permanent public record of their views, activities, and behavior. This public record can be thought of as an online reputation, which may be accessible to schools, employers, colleges, clubs, and others who may be researching an individual now or in the future. Cyberbullying can harm the online reputations of everyone involved – not just the person being bullied, but those doing the bullying or participating in it. Cyberbullying has unique concerns in that it can be:

**Persistent** – Digital devices offer an ability to immediately and continuously communicate 24 hours a day, so it can be difficult for children experiencing cyberbullying to find relief.

**Permanent** – Most information communicated electronically is permanent and public, if not reported and removed. A negative online reputation, including for those who bully, can impact

college admissions, employment, and other areas of life.

**Hard to Notice –** Because teachers and parents may not overhear or see cyberbullying taking place, it is harder to recognize.

# Laws and Sanctions

All states have laws requiring schools to respond to bullying. As cyberbullying has become more prevalent with the use of technology, many states now include cyberbullying, or mention cyberbullying offenses, under these laws. Schools may take action either as required by law, or with local or school policies that allow them to discipline or take other action. Some states also have provisions to address bullying if it affects school performance. You can learn about the laws and policies in each state, including if they cover cyberbullying.

# Frequency of Cyberbullying

There are two sources of federally collected data on youth bullying:

- The 2019 School Crime Supplement to the National Crime Victimization Survey (National Center for Education Statistics and Bureau of Justice) indicates that, nationwide, about 16 percent of students in grades 9–12 experienced cyberbullying.
- The 2021 Youth Risk Behavior Surveillance System(Centers for Disease Control and Prevention) indicates that an estimated 15.9% of high school students were electronically bullied in the 12 months prior to the survey.

See also "Frequency of Bullying."

Date Last Reviewed: November 5, 2021